## Waltman *et al. versus* Herdic *et al.*

1. If the grantor of the title to land in dispute is dead, and he never had any transaction or communication of any kind with the adverse party to a suit brought to try the title to the land, he was not an "assignor of the thing or contract in action," within the meaning of the Act of 1869, and the adverse party is competent as a witness.

2. T., one of the defendants in an action of ejectment for a tract of land, was offered as a witness in his own behalf to prove such actual possession as had vested title in himself. It was objected that he was incompetent, "because B., whose estate still holds the legal title, as shown by the plaintiffs in suit, is dead." There was no privity between B. and T.; no contract relation, nor were their respective titles links of the same chain, and aside from these, T. set up title under the Statute of Limitations. It was not proposed to show by T. anything that B. had ever done or said, and plaintiffs did not show anything tending to prove that there was any communication between them respecting the land. *Held*, that the court erred in rejecting the offer.

June 4th 1879. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY and STERRETT, JJ. WOODWARD, J., absent.

Error to the Court of Common Pleas of *Lycoming county :* Of May Term 1879, No. 174.

Ejectment by Peter Herdic and others against John Waltman, Henry Waltman and Samuel Titus, for a tract or strip of land between two surveys respectively entitled the "Jean Brady and Jennet Hepburn" surveys.

On June 8th 1792, Jennet Hepburn was granted a warrant to appropriate two hundred acres of land on William Hammond's run, including said run, and adjoining land of William Winter, about two miles from the river, in Loyalsock township, (then) Northumberland county. A survey was made May 17th 1793, as containing two hundred and sixteen acres and allowance, calling for an ash as the south-east corner, twenty-one perches east of Hammond's run, by the plot; thence north eighteen east to white oak one hundred and five (by the figure or draft the course is plotted about north eighteen west); thence north forty-five east one hundred and eighteen perches to white oak at intersection of top line crossing Main run and branch, plotted as thirty perches in length, but by measurement on the ground and scale of draft forty-four perches long. The survey, as made on the ground, and as called for in the patent granted April 17th 1794, to Jennet Hepburn, intermarried with Matthew Wilson, is for a course north eighteen east from an ash corner. Jennet Wilson and Matthew Wilson died intestate, leaving five heirs, one of whom, Mary, intermarried with Manning Stevenson. By articles of agreement and deed, the one undivided fifth part of the Jennet Hepburn survey was sold to Samuel Titus, one of the defendants, who took possession of the same, May first 1827, cutting timber up to the line as claimed by defendants, the same year.

[Waltman *v.* Herdic.]

Plaintiffs claimed under a warrant to Jean Brady, dated November 13th 1792, for two hundred acres, described as adjoining lands of S. Wallis, including Hagerman's run, in Washington township, one mile south of the Susquehanna river; surveyed May 8th 1794, containing two hundred and four acres. On January 24th 1828, the warrant was sold for taxes by the treasurer of Lycoming county, to John Vanderbelt, William Harris, Peter Vanderbelt, and Charles Low, who, with William Wilson, a surveyor and congressman (not related to the William Wilson who was one of the heirs of Jennet Hepburn Wilson), petitioned the board of property for a resurvey of the Jean Brady, alleging it interfered with the Jennet Hepburn survey and others. December 30th 1828, a resurvey was ordered, providing it does not interfere with others, &c. August 27th 1830, a resurvey was made, returned and patented to William Harris, John Vanderbelt, Peter Vanderbelt and Charles Low. This resurvey crosses the south-east corner of the Jennet Hepburn, by giving it its official courses and distances, by twenty-one and three-tenths perches at the south line of the Jennet Hepburn, including Hammond's run as part of the Jean Brady survey, which ran from the white oak witness at the north-east corner of the Jennet Hepburn tract, and does not close at the ash corner and pine witness at the south-east corner of the Jennet Hepburn survey. The survey as claimed by these plaintiffs in the writ does not cross Hammond's run by dropping eight perches on each of the two lines—the south forty-eight west one hundred and ten line (a reverse of north forty-five east one hundred and eighteen) from the upper white oak, thence south twenty-one west ninety-seven and two-tenths (a reverse of north eighteen east one hundred and five), coming within five or seven feet of the run to a post. The ash corner is shown by the scale on the plot and measurement to be from seventeen to twenty perches eastward from the run. In the year 1832, the owners of the Jennet Hepburn survey amicably divided the Jennet Hepburn survey, leaving the strip of land interfered with by the Jean Brady resurvey undivided, with an agreement among themselves, that whoever of them contended for the same should have the other heirs' interests therein, as the same belonged to their survey.

Titus alleged he used this land for its wood and timber, in connection with his larger purpart or farm, as a wood lot appurtenant, for more than twenty-one years, without any one to gainsay his right thereto. In 1849 he sold a part of it to Joshua Hall, who built a house thereon and cultivated a garden therewith. Henry Johnson purchased his house the next year and occupied the same, and maintained the possession of the whole strip in dispute up to the bringing of this suit, in December 1876, for Mr. Titus, except a quarry, which was worked by Mr. Waltman under agreement with Mr. Titus. In 1852 a suit was commenced in ejectment by Daniel

Billman against Titus and his tenants—Hall, Johnson and Hoff-man—claiming part of this strip, four acres, more or less, as belonging to the Jean Brady; but this suit was abandoned. The whole of the Jennet Hepburn has been seated for more than sixty years.

At the trial, before Cummin, P. J., the plaintiffs put in their paper title, by which it appeared that they were entitled to that portion of the land surveyed in the Jean Brady warrant which adjoined the lands surveyed in the Jennet Hepburn warrant. The claim of the plaintiffs was confined to the lands surveyed on the warrant of Jean Brady, and they made no claim or title to any part of the lands surveyed on the warrant Jennet Hepburn.

The paper title of the defendants related entirely to the lands surveyed on the Jennet Hepburn warrant, and under their paper title they were to be confined in this case to the lands surveyed on the warrant Jennet Hepburn, and by virtue of their paper title they had no claim upon any lands surveyed on the warrant Jean Brady.

In addition, however, to what the defendants claimed on their paper title, they also claimed that Titus, one of the defendants, and under whom the other defendants claimed, had acquired title to the land in dispute by having occupied it for a period of twenty-one years.

Plaintiffs proved that Daniel Billman, the former owner of the Jean Brady tract, was dead, and that the legal title to one-half of the land in dispute was still in his heirs, and alleged that they were bound to make title under contract, and bound by a covenant of general warranty in a conveyance of the legal title to three of the plaintiffs of the other half. Defendants offered to prove by Titus, one of the defendants, that he purchased an interest in the Jennet Hepburn survey in the year 1827. That he took possession of the same, and that his possession taken and maintained from that time, under a claim of title of the warrant and survey Jennet Hepburn, included the land described in plaintiffs' writ up to this line as run by Mr. McHenry from the stone along the brush fence spoken of, &c. That in 1849 he sold a part of this land in dispute to Joshua Hall, and put him in possession of the same. That Mr. Hall and others erected a house and made a garden and other improvements up to this line, as indicated by the stone and the brush fence, and as his agents maintained possession of the entire strip now in dispute for more than twenty-one years, to be followed by evidence of the location up to this brush fence line, recognition by the owners of the part of the Jean Brady adjoining it on the east; this for the purpose of showing his title and possession to the land in dispute.

The plaintiffs objected, inter alia, because Daniel Billman, whose estate still holds the legal title as shown by the plaintiffs in this suit, is dead, having in his lifetime conveyed only an equitable

[Waltman *v.* Herdic.]

interest to the parties, and that the witness, Samuel Titus, being defendant in the issue, is incompetent to testify in this case as to any matters that occurred during the lifetime of Billman. The court sustained the objection, and excluded the witness on the ground of incompetency.

The verdict was for the plaintiffs for the land described in the writ. Defendants took this writ, their eleventh assignment of error being the rejection of Titus as a witness on the grounds above stated.

*G. W. Youngman* and *S. L. Youngman,* for plaintiffs in error. —Since the Act of April 15th 1869, all witnesses are prima facie competent: McClelland *v.* West, 20 P. F. Smith 183. No executor or administrator was a party, and that a decedent's estate might be affected by an adverse decision is too .remote. For the same reason all parties to ejectment suits founded on conveyances of date beyond the present generation would be incompetent, and the Act of 1869 become a mere nullity. The principle of the decision in Karns *v.* Tanner, 16 P. F. Smith 297, does not apply. Defendant, Titus, did not claim as assignee, nor by conveyance in which decedent, Billman, had ever been interested as a party with him. In Craig *v.* Brendel, 19 P. F. Smith 153, the decision of Karns *v.* Tanner, 16 Id. 297, is distinguished, and Brendel was admitted as a competent witness for his wife, against Craig's representatives, Craig having brought ejectment for the land in controversy as sheriff's vendee of Brendel, the husband. In Insurance Co. *v.* Shultz, 1 Norris 46, it is held that after the death of an agent with whom a contract was made, defendant may testify against principal. In 24 P. F. Smith 476, and 26 Id. 180, it is held that the death of an intermediate vendee does not render either party to the original contract incompetent.

*R. P. Allen* and *J. A. Beeber,* for defendants in error.—The plaintiffs offered to prove by the evidence of Samuel Titus, one of the defendants, that he took possession of the land in dispute, exercised rights of ownership over it, and that his possession was recognised by the owners of the Jean Brady tract.

The offer was in effect to prove, by one of the parties to the suit, admissions made by Daniel Billman during his lifetime, he being the assignor or grantor of the land in dispute, part of whose title passed by his own act to the plaintiffs, and the title to the remaining portion still being in his heirs. The witness was clearly incompetent for such purpose before the Act of April 15th 1869, allowing parties to be witnesses, and comes within the terms of the proviso of the first section of said act, Daniel Billman being dead and the assignor of the thing in dispute: Karns *v.* Tanner, *supra;* Hanna *v.* Wray, 27 P. F. Smith 27 ; Standbridge *v.* Cantenach, 2 Norris 368 ; Arthurs *v.* King, 3 Id. 528.

[Waltman v. Herdic.]

Mr. Justice TRUNKEY delivered the opinion of the court, June 23d 1879.

The Act of 15th April 1869 does not apply to actions where the assignor of the thing or contract in action may be dead. If Billman were an assignor within the sense of the statute, as to matters which occurred in his lifetime, the competency of Titus to testify would be determined by rules that existed before its enactment. Where the subject of the action is a contract, it is obvious that a deceased party thereto, whose rights have passed to one of the parties in the action, is an assignor in the intendment of the proviso, as clearly so as if the suit were by or against an executor. Then it is easily seen that the case is within the true spirit of the proviso which has been said " to be that where a party to a thing or contract in action is dead, and his rights have passed, either by his own act or that of the law, to another, who represents his interest in the subject of controversy, the surviving party to that subject shall not testify to matters occurring in the lifetime of the adverse party, whose lips are now closed:" Karns v. Tanner, 16 P. F. Smith 297. But when the subject of litigation is real estate, it often seems difficult to decide if the act applies; yet the spirit and reason of the law will as surely guide as if the subject were a contract. A grantor of the title on one side may be dead; if he had no transaction or communication of any kind with the adverse party, or one under whom he claims, he is not an assignor in the meaning of the statute. Where there was no privity between the deceased assignor and the opposing party, as a general rule the act applies. The converse is equally true. If nothing occurred in the lifetime of the deceased between him and the survivor, the case is unlike one where the subject is a contract. The decisions accord with the rule stated. In Karns v. Tanner, supra, the pivotal question was the validity of a lease which Parker, one of the defendants, had given to James P. Tanner, whose title after his decease had become vested in the plaintiff. So in Arthurs v. King, 3 Norris 525, each party claimed the land under Zimmerman; Arthurs by deed from Zimmerman's executor; King under a deed executed by Zimmerman in his lifetime to Bascom, in pursuance of a parol contract with Boyer, as alleged. Held that Boyer and Bascom were incompetent to prove the contract and delivery of the deed. The privity between the decedent and adverse survivor, in each of these cases, is manifest. In the latter, STERRETT, J., said: " In construing the act, it has been held that where one of two parties to a transaction is dead, the survivor and the party representing the deceased stand on an unequal footing as to the knowledge of the transaction occurring in the lifetime of the deceased. The proviso was intended to exclude parties to the transaction from being witnesses in regard to it when the opposite party is dead and his rights have become vested in others, by his own act or by ope-

ration of law." Craig *v.* Brendel, 19 P. F. Smith 153, decided in less than a year after Karns *v.* Tanner, illustrates the principle where privity was not an element. Craig purchased the land at sheriff's sale as the property of Brendel, brought ejectment, died, and his devisees were substituted. Brendel never claimed title; it was in his wife; and he was held a competent witness. After referring to Karns *v.* Tanner, AGNEW, J., said: "It will be observed that there Parker and Tanner stood in the relation of opposing parties to the same matter or contract of lease, and also in relation to the thing itself which was the subject of their contract or lease." "But the present case is essentially different. While it may be considered as true that John Craig, the devisor of the plaintiffs, is their assignor in law, according to Karns *v.* Tanner, yet Frederick L. Brendel, the defendant here, who was offered as the witness, does not stand as the party opposite to them in the thing or transaction which is the subject of the controversy in this suit." We need not note the remarks in effect that Brendel was competent and his wife not; the gist of the reason for Brendel's competency was absence of privity of any transaction between him and John Craig relative to the land in controversy. He was not called to testify to anything that had occurred between him and Craig, and could not have been, for nothing had passed between them.

Samuel Titus, one of the defendants, was offered as a witness, in his own behalf, to prove such actual possession as had vested title in himself, and was excluded for incompetency, "because Daniel Billman, whose estate still holds the legal title, as shown by the plaintiffs in this suit, is dead, having in his lifetime conveyed only an equitable interest to the parties." The first thing that arrests attention is the absence of privity between Billman and Titus. There is no semblance of contract relation. Nor are their respective titles links of the same chain. Before Billman had an interest in the Brady tract, while he lived, and since his death, Titus claimed the land in suit as part of the Hepburn warrant. The plaintiffs, holding under Billman and others, demand nothing beyond the Brady survey. Aside from location of the original tract line, Titus sets up title under the Statute of Limitations, the very nature of which excludes its derivation from Billman. There was no proposal to prove by Titus anything that Billman ever said or did, and plaintiffs point to nothing tending to show that there ever was any communication between them respecting the land. If the survivor is incompetent, where will competency begin when some grantor in the chain of title of the opposing party is dead? Can it be that if one party derives title through or under a deceased grantor, however remote, neither can be a witness? Proximity or remoteness of the deceased grantor is of no consequence, for the true inquiry is, has death sealed the lips of one party to a

[Waltman *v.* Herdic.]

,transaction of which both had knowledge? The proviso was not intended to exclude a party in such a case as this, and we are of opinion there was error in rejecting the offer set forth in the eleventh assignment.

--To understand the evidence, and rulings of the court, it must be kept in view that, since May 1st 1832, Wilson and those under him have had .the deeds for that part of the Hepburn tract adjoining the Brady; that Titus owned no land adjoining that in dispute; and that the land in suit was unimproved and unenclosed woodland, except a fraction of an acre at one end enclosed to extent its occupant claimed. The learned judge was clearly right in his instructions to the jury upon the evidence before them, and none of the assignments of error relating to the charge and answers to points can be sustained.

Judgment reversed, and a *venire facias de novo* awarded.